UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

LENA J. DANIEL,

                   Plaintiff,

   v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

                  Defendant.

Case No. 2:14-cv-01728-JCM-PAL

**REPORT OF FINDINGS AND
RECOMMENDATION**

(Mot. to Remand – ECF No. 17)
(Cross-Mot. to Affirm – ECF No. 18)

This matter involves Plaintiff Lena J. Daniel's appeal and request for judicial review of the Acting Commissioner of Social Security, Defendant Nancy A. Berryhill's final decision denying her claim for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33, and claim for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

## BACKGROUND

Plaintiff Lena J. Daniel ("Daniel") filed a Title II application for disability benefits on May 21, 2009, at the age of 45, and also protectively filed a Title XVI application for supplemental security income on June 2, 2009.  AR 381–83, 386–91.[2]  These applications initially alleged a disability onset date of December 22, 2004.  In her applications, Daniel claimed she was unable to

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to the Federal Rules of Civil Procedure and the Social Security Act, the court therefore substitutes Nancy A. Berryhill for Carolyn W. Colvin as the defendant in this suit.  *See* Fed. R. Civ. P. 25(d) (allowing the automatic substitution of a successor to a public officer who is a party to an action but ceases to hold office while the action is pending); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] AR refers to the Administrative Record (ECF No. 13), a certified copy of which was delivered to the undersigned upon the Commissioner's filing of her Answer.

1

work because of: (1) mood disorder; (2) bipolar disorder; and (3) depression. AR 406. Her work history reports indicate she previously worked in clerical and administrative roles as an office assistant and customer service representative. AR 412–19. The Social Security Administration (the "Agency") denied Daniel's application initially and on reconsideration. AR 147–50.

An administrative law judge ("ALJ") held a hearing on March 3, 2011, where Ms. Daniel appeared with counsel. AR 123–46. During the hearing, counsel amended Daniel's alleged onset date to November 30, 2009, as the record contained no medical evidence prior to 2007. AR 125–26. This amendment of the alleged onset date effectively precluded her Title II application because her date last insured was September 30, 2009. *Id.*; *see also* AR 154. Daniel's counsel asserted that the theory of her case stemmed from her mental problems, not physical problems. AR 125–26. The ALJ left the record open for 30 days to allow Ms. Daniel to supplement with additional medical records and he also ordered a psychological examination with testing. AR 127, 145. The ALJ issued a decision on June 3, 2011 (the "2011 decision"), finding that Daniel was not disabled and she was capable of performing her past relevant work as an office assistant. AR 154–62. Ms. Daniel requested review of the ALJ's decision by the Appeals Council. AR 224.

The Appeals Council issued an order vacating the 2011 decision and remanding the case to the ALJ for further consideration. AR 225–29. The Order stated that further consideration was needed on whether Ms. Daniel could work as an office assistant because her residual functional capacity limited her to brief encounters with the public and coworkers but the mental demands of an office assistant require more than brief encounters. AR 227. Additionally, the Appeals Council found that the mental limitations included in her RFC would significantly compromise the potential occupational base for medium unskilled work. *Id.* However, the ALJ's decision lacked supporting evidence from a vocational expert. *Id.* Lastly, the Order noted that the 2011 decision did not evaluate Ms. Daniel's obesity as required by Agency regulations. *Id.* The Appeals counsel instructed the ALJ to address these three deficiencies on remand. AR 228.

A brief second hearing was held on February 2, 2012. AR 90–101. Because Ms. Daniel appeared at the hearing without counsel, the ALJ continued the matter to allow her to secure new legal representation. *Id.*

2

The ALJ held a third hearing on July 12, 2012. AR 102–22. Ms. Daniel appeared at this hearing with new counsel who amended her alleged onset date to September 29, 2009. AR 106. This second amendment reinstated her Title II application. *Id.* The ALJ suspended the third hearing to further develop the record. AR 119. The ALJ asked Daniel's counsel for medical records regarding Ms. Daniel's newly alleged physical impairments and ordered a second psychological exam, an orthopedic exam, and a vision exam. AR 113–14, 119–21.

A fourth hearing was held on February 26, 2013. The ALJ accepted testimony from Daniel, AR 70–72, 81–88, and a vocational expert, AR 73–81. The ALJ held the record open for 30 days to allow Ms. Daniel to submit all of her mental health records. AR 72, 88–89. In a decision dated April 12, 2013, the ALJ found that she was not disabled. AR 17–42. Ms. Daniel again requested review of the ALJ's decision by the Appeals Council, but the ALJ's decision became final when review was denied on August 19, 2014. AR 1–6.

On October 17, 2014, she filed a Complaint (ECF No. 1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Commissioner filed her Answer (ECF No. 10) on March 9, 2015. Ms. Daniel filed a Motion to Remand (ECF No. 17), and the Commissioner filed a Cross-Motion for Summary Judgment and Response (ECF Nos. 18, 19). The court has considered the Motion, Cross-Motion and Response, and Reply (ECF No. 20).

## DISCUSSION

I. **APPLICABLE LAW**

   A. **Judicial Review of Disability Determination**

   Federal district courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g). *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002). The statute provides that after the Commissioner has held a hearing and rendered a final decision, a disability claimant may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial district where the disability claimant lives. 42 U.S.C. § 405(g). The statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005). But the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). In determining whether the Commissioner's findings are supported by substantial evidence, a court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

Under the substantial evidence test, a court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003). When the evidence will support more than one rational interpretation, a court must defer to the Commissioner's interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Consequently, the issue before a court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent upon an ALJ to make specific findings so that a court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's findings should be comprehensive, analytical, and include a statement explaining the "factual foundations on which the ultimate factual conclusions are based." *Id. See also Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record, but must explain why significant probative evidence has been rejected).

4

### B. Disability Evaluation Process

A claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant must provide specific medical evidence to support his or her claim of disability.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).  If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy.  *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II.  THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether a claimant is disabled.  20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

Here, the ALJ followed the five-step sequential evaluation process and issued an unfavorable decision on April 12, 2013 (the "Decision").  AR 20–34.  Ms. Daniel does not challenge the ALJ's findings at any particular step, but asserts that the ALJ failed to articulate reasons supported by substantial evidence for rejecting the opinion of a psychological examining physician.  The parties stipulate that the ALJ fairly and accurately summarized the evidence and testimony of record in the Decision, except as specifically addressed in their arguments.

### A. Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Substantial gainful activity is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  20 C.F.R. §§ 404.1572(a)–(b), 416.972(a)–(b).  If the claimant is currently engaging in substantial gainful

activity, then a finding of not disabled is made. If the claimant is not engaging in substantial gainful activity, then the analysis proceeds to the second step.

At step one in the Decision, the ALJ found that Ms. Daniel had not engaged in substantial gainful activity since September 29, 2009, the amended alleged onset date. AR 22. Given her lack of substantial gainful activity, the ALJ's analysis proceeded to the second step.

### B. Step Two

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work. 20 C.F.R. §§ 404.1521, 416.921; Social Security Ruling ("SSRs") 85-28, 1985 WL 56856 (Jan. 1, 1985), SSR 96-3p, 61 Fed. Reg. 34468 (July 2, 1996); SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[3] If a claimant does not have a severe medically-determinable impairment or combination of impairments, then an ALJ will make a finding that a claimant is not disabled. If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

At step two in the Decision, the ALJ found that Ms. Daniel had the following severe impairments: (i) panic disorder (with agoraphobia features), (ii) bipolar disorder not otherwise specified (with psychotic features), and (iii) chronic right knee pain from osteoarthritic changes and a tear of the medial meniscus, and (iv) obesity. AR 22. In making his findings at step two, the ALJ specifically considered all of her medically determinable impairments, including the non-severe impairment of right ankle pain status post right ankle surgery with evidence of old trauma to the lateral malleolus. AR 23. Because it did not more than minimally limit her ability to perform basic work activities, the ALJ determined that the right ankle pain was a non-severe impairment.

---

[3] SSRs are the Agency's official interpretations of the Act and its regulations. *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1). SSRs are entitled to some deference as long as they are consistent with the Act and Agency regulations. *See Bray*, 554 F. 3d at 1223. "SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Id*. at 1224.

AR 23. The ALJ considered the combined effect of all of her impairments on her ability to function, including her obesity, to evaluate her RFC. *Id.* Because Ms. Daniel had four severe medically-determinable impairments, the ALJ's analysis proceeded to the third step.

## C. Step Three

Step three of the disability evaluation requires an ALJ to determine whether a claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings." 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826. If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings and meet the duration requirement, 20 C.F.R. §§ 404.1509, 416.909, then an ALJ makes a finding of disability. 20 C.F.R. §§ 404.1520(h), 416.920(h). If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

When the Agency evaluates the severity of mental impairments, 20 C.F.R. § 404.1520a requires the use of a "special technique" to evaluate four broad functional areas known as the "Paragraph B Criteria" in Listing 12.00C of the Listing of Impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.*; *see also* 20 C.F.R. § 1520a (explaining the psychiatric review technique); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996) (noting that application of the technique is documented on a Psychiatric Review Technique Form). Paragraph B criteria require a claimant to show that he or she experienced marked limitations in mental function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. To satisfy Paragraph B criteria, mental impairments must result in at least two of the following: (i) marked restriction in activities of daily living; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation, each of extended duration. *See, e.g.*, *id.* § 12.04(B). A "marked" limitation means "more than moderate but less than extreme." *Id.* § 12.00(C). Repeated episodes of decompensation with extended duration means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.* § 12.00(C)(4).

If the Paragraph B criteria are not met, a claimant may nevertheless be found disabled under alternative Paragraph C criteria. *Id*. § 12.00(A). Under the regulations, Paragraph C criteria are considered only if the Paragraph B criteria are not satisfied. *Id*. Paragraph C criteria require a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement. *See* §§ 12.02(C), 12.03(C), 12.04(C), 12.05(C), 12.06(C).

At step three, the ALJ determined that the evidence did not support a finding that Ms. Daniel had the severity of symptoms required, either singly or in combination, to meet or equal Listings 1.02 (major dysfunction of a joint), 12.03 (schizophrenic, paranoid and other psychotic disorders), or 12.04 (affective disorders). AR 23. With regard to Listings 12.03 and 12.04, the ALJ specifically evaluated the Paragraph B Criteria and concluded that the greater weight of the evidence showed Daniel suffered: (i) no restrictions in activities of daily living; (ii) mild to moderate difficulties in social functioning; (iii) moderate limitations in concentration, persistence, or pace; and (iv) no episodes of decompensation that have been of extended duration. AR 24; *see also* AR 524–37 (Psychiatric Review Technique Form). The ALJ also considered Paragraph C criteria for Listings 12.03 and 12.04; however, the record lacked evidence of Paragraph C criteria. AR 24. The ALJ therefore concluded that she did not have an impairment or combination of impairments that meet or medically equal one of the impairments described in the Listings. *Id*. As such, the ALJ's analysis continued to her residual functional capacity ("RFC").

**D. Step Four – RFC**

The fourth step of the disability evaluation requires an ALJ to determine whether a claimant has the RFC to perform her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). To answer

this question, an ALJ must first determine a claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is a function-by-function assessment of a claimant's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments. SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996). In making this finding, an ALJ must consider all the relevant evidence such as symptoms and the extent to which they can be reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996). To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the credibility of a claimant's statements based on a consideration of the entire case record. An ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 as well as SSR 96-2p, 61 Fed. Reg. 34489 (July 2, 1996); SSR 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006).

After considering the entire record, the ALJ concluded that Ms. Daniel had the RFC to perform "less than medium work" as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c):

> She could lift/carry fifty pounds occasionally and twenty-five pounds frequently, could sit for six hours in an 8-hour workday, with customary breaks, stand/walk about six hours in an 8-hour workday, frequently engage in postural activities, except can only occasionally stoop, crawl and crouch, with no crawling, or climbing of ladders. She could not work around unprotected heights. She was limited to simple work activity, defined as work with an SVP of 1 or 2, and restricted to only occasional interaction with co-workers and the public.

AR 25. In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and the other evidence." *Id*. He also considered opinion evidence. Although the ALJ found that Daniel's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he determined that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC assessment. *Id*.

Ms. Daniel's sole challenge on appeal alleges the ALJ failed to articulate reasons supported by substantial evidence for rejecting the opinion of Teri F. Belmont, Ph.D., the examining

psychologist who performed a second consultative evaluation. She does not challenge the ALJ's findings regarding the examining physicians who evaluated her physical conditions. Accordingly, the following summary outlines only the portions of the Decision related to her mental impairments.

### 1. Mental Health Symptoms and Treatment

Ms. Daniel reported heavy use of crystal methamphetamine and alcohol between 2000 and 2007. AR 689. In December 2004, she presented to the emergency room with depression and suicidal ideation. AR 624. She denied any previous psychiatric history or hallucinations. AR 624. A toxicology screening identified methamphetamine and amphetamine in her urine. AR 626. In September 2007, Daniel hit her sister while high on drugs and her sister called the police. AR 567, 689. Ms. Daniel told the police that she was feeling suicidal and her sister decided not to press charges. AR 565–67, 689. Daniel was released with a referral to Southern Nevada Adult Mental Health ("SNAMH") for treatment. *Id.*

SNAMH diagnosed Daniel with panic attacks, anxiety, depression, and bipolar disorder. AR 25, 689. Her records from SNAMH note significant psychosocial stressors including housing instability and a criminal history. AR 25 (citing AR 691). She reported a history of occasional visual and auditory hallucinations. AR 500, 503, 559, 568, 693. In October 2007, a SNAMH evaluation states that her treatment plan included an antidepressant and Depakote. AR 504–05. In multiple treatment notes, Daniel reported that she was doing well, including on the date of alleged onset, September 29, 2009. *See, e.g.*, AR 543–45. She was alert, cooperative, well groomed, and displayed good attention and concentration. AR 508, 543, 556, 558–59, 726. She stated in March 2010 that her depression "comes and goes." AR 560. In April 2011, she reported she had not used drugs since 2007; however, she admitted to a few slip ups using crystal meth. AR 589.

Ms. Daniel consistently reported that she was medication compliant. *See, e.g.*, AR 542, 555, 559, 726. A November 2010 treatment notes states that she would continue with her medications: Geodon, Wellbutrin, Depakote, and Cogetin. AR 556. In April 2011, she was taking Bupropion for depression, Geodon for psychotic symptoms, Simvastatin for cholesterol, Depakote

which may be prescribed for bipolar disorder or panic disorder, Hydroxyzine for anxiety, Lovoxyl for thyroid symptoms, and Benztropine for a sleep disorder. AR 566. Ms. Daniel stated that she felt "pretty good" about her medications and she repeatedly denied any medication side effects. AR 509, 513–17, 543, 545, 555, 557, 559, 591, 607, 620, 711, 726–27, 775–77, 779–80. She was described on numerous occasions as "low risk" and "stable" despite some ongoing symptoms. AR 586–87, 593, 605, 607, 613, 726, 781.

SNAMH gave Ms. Daniel a Global Assessment of Functioning ("GAF") score of 55 during her first evaluation in October 2007.[4] AR 504. By August 2010, her GAF had improved to 70. AR 558. In February 2011, treatment notes indicate her GAF was 80. AR 551. However, her GAF was 60 in January 2012 and again in April 2013. AR 605, 779.

## 2. Psychological Exam with Dr. Wilson

On April 16, 2011, Daniel underwent a psychological consultative examination with Warner Wilson, Ph.D. *See* AR 565–72. She described a long history of using alcohol and methamphetamines and, at the age of 35, was hospitalized for attempting suicide. AR 566. Ms. Daniel was using methamphetamine, both before and after this hospitalization, which lead the ALJ to infer a substance-induced psychosis. AR 26 (citing AR 565–66). She admitted to worry, anxiety, depression, mood swings and "to literally all particular symptoms of anxiety and depression." AR 567. She also admitted to suicidal ideation, paranoid ideation, and to auditory and visual hallucinations. *Id*. Daniel described hearing voices when she was away from home that told her to go back home. AR 568. She also reported frequent panic attacks, leaving Dr. Wilson with the impression that they were her single worse problem. AR 566–67.

Dr. Wilson noted that Daniel was alert, friendly, and cooperative throughout the exam. AR 568. She was oriented to time, place, person, and purpose. *Id*. During her mental status examination, Ms. Daniel's mood was appropriate, her attitude cooperative, and her replies were

---

[4] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 2000) ("DSM IV"). A GAF score is a generalized description of the claimant's level of psychological symptoms. *See id.* at 32. However, GAF scores do not directly correlate to the severity assessments utilized in Social Security disability determinations. *See* 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000).

logical, coherent, and relevant. AR 567. During testing, she performed serial threes without error. AR 568. Her delayed recall was intact, and she could recall "3/3" items following five and 15 minute delays. *Id*. Although she alleged audio and visual hallucinations, Dr. Wilson did not observe any evidence of thought disorder. AR 570.

In his functional assessment, Dr. Wilson opined that Ms. Daniel's cognitive functions may have been better than her scores suggested. *Id*. She performed poorly on the Test of Memory Malingering ("TOMM") and other test scores were of doubtful validity. AR 569–70. The psychologist assigned a GAF of 54, but clearly expressed his concerns about the validity of test results and Daniel's reliability. AR 570–71. Dr. Wilson opined that despite her low test scores and their uncertain validity, Daniel could still perform simple tasks, typical of unskilled work:

> Her ability to understand, remember, and carry out an extensive variety of complex instructions is probably poor, her ability to handle detailed but uncomplicated instructions may also be poor, but her ability to follow simple instructions is good. Her own ratings were similar. It seems to me that she should be able to get along with supervisors, coworkers, and the public, and this was her opinion also. She can maintain concentration to carry out tasks as indicated.

AR 570. He assessed malingering, panic disorder with agoraphobia, and bipolar disorder not otherwise specified with psychotic features. AR 570–71. Although he considered Ms. Daniel's prognosis poor, the psychologist stated that "even her low test scores would allow for performing simple tasks." AR 571.

The ALJ gave "little weight" to Dr. Wilson's opinion and GAF score because he only examined her one time and his findings were contradicted by Ms. Daniel's mental health providers, who had an ongoing relationship with her and had seen her many times. AR 27.

### 3. Psychological Exam with Dr. Belmont

On August 6, 2012, Ms. Daniel underwent a second psychological consultative examination with Teri F. Belmont, Ph.D. AR 689–99. Daniel provided a consistent history of her symptoms and mental health treatment. *See* AR 27–28. Her eye contact was appropriate and she was friendly and cooperative. AR 693. She presented as mildly to moderately depressed, as evidenced by frequent tearfulness, although the periods of tearfulness did not last long. *Id*. Dr. Belmont noted that Daniel appeared extremely anxious and tense during most of the interview but

grew more relaxed during the mental status examination tasks. *Id*. She displayed some shakiness related to her anxiety, but otherwise no significant verbal or nonverbal pain behaviors or abnormal involuntary movements. AR 692. She did not appear to be responding to internal stimuli. AR 693.

Ms. Daniel reported panic attacks to Dr. Belmont but denied suicidal or homicidal feelings, thoughts, or plans. *Id*. She did not describe or demonstrate excessive somatic preoccupation. *Id*. She reported occasional command hallucinations, but she primarily experienced these symptoms in 2006 before she stopped using drugs or began receiving mental health care. *Id*. She denied visual or auditory hallucinations since using Geodon. *Id*. With regard to orientation and alertness, she was fully attentive and had a normal level of alertness. *Id*. Dr. Belmont opined that Daniel did not demonstrate symptoms of a diagnosable psychotic disorder. *Id*.

During the cognitive function exam, Ms. Daniel correctly recalled strings of four digits on two occasions and five digits on one occasion (both forward and backward). AR 693. Her performance was notably slow on the backwards testing as she frequently repeated the digits forward to herself under breath in order to remember and subsequently reverse them. *Id*. She correctly defined five of seven words, but adequately defined relationships between only one of six word pairs. AR 694. She recalled three of three simple words immediately but only one after a five-minute delay. *Id*. She adequately answered five of eight fund of information questions. *Id*.

Regarding her consistency and effort, Dr. Belmont opined that Daniel "may have difficulty accurately describing to others her experience of emotional phenomenon as a result of her current emotional distress and a possibly below-average level of intellectual functioning." AR 695. For these reasons, the psychologist was not convinced that Daniel met diagnostic criteria for bipolar disorder, given that she primarily demonstrated symptoms during periods of substance abuse and she received no mental health treatment until 2007, with the exception of her suicide attempt in 2004 while she was high on drugs. *Id*. Alternatively, Dr. Belmont found it plausible that Ms. Daniel had "become a characterologically angry, depressed, and anxious individual as a result of experiencing significant psychosocial stressors dating back to childhood. These factors, in combination with her possibly somewhat below-average level of intellectual functioning, may largely account for her history of poor coping and decision-making skills." AR 695.

Dr. Belmont did not get a clinical impression of malingering, in contrast to Dr. Wilson. *Id.* Ms. Daniel presented "consistently and believably" as "mildly to moderately depressed and extremely anxious and tense during most of the interview." *Id.* The psychologist doubted that Daniel consciously attempted to feign cognitive impairment or exaggerate her psychiatric symptoms during Dr. Wilson's evaluation. *Id.* Rather, Dr. Belmont opined that Daniel's test performance "may well have represented an unsophisticated cry for help." *Id.*

Functionally, Dr. Belmont opined that Ms. Daniel

> should be able to understand, remember, and carry out simple one-and two-step instructions on at least a part-time basis. However, as a result of possibly below-average intellectual functioning in conjunction with her current experience of significant depression and anxiety she may not be able to maintain the concentration and attention necessary to do so, and she may also have difficulty remembering, understanding, and carrying out a variety of detailed and complex instructions on even a part-time basis.

AR 695. The psychologist questioned whether Daniel had the ability to "interact appropriately with supervisors, co-workers, and the public on even a part-time basis" based on her significant anxiety. *Id.* Although she was friendly and cooperative with Dr. Belmont, Daniel "appeared to be extremely anxious, and accordingly reported having significant panic any time she leaves the house." *Id.* She demonstrated "lapses in attention and concentration during mental status testing that were probably related to this anxiety." *Id.* Dr. Belmont opined that Daniel's emotional symptoms did not appear to be adequately controlled on her medication regimen. *Id.*

Dr. Belmont diagnosed Daniel with panic disorder with agoraphobia (with features of generalized anxiety disorder), mood disorder not otherwise specified (consider major depressive disorder, unspecified), and amphetamine dependence in full sustained remission. AR 695. Her prognosis was guarded given the "chronic and somewhat intractable nature" of Daniel's psychiatric symptoms, despite her medication regimen. *Id.* She was given a GAF of 55–60. *Id.*

Because Dr. Belmont's opinion was not consistent with Ms. Daniel's treatment notes and other objective medical records, the ALJ gave it "little weight overall." AR 29.

### 4. Review by State Agency Physicians

The ALJ also considered the findings of the state agency review physicians, Susan Kotler, Ph.D., and Mark Richman, Ph.D. *See* AR 518–23 (Oct. 8, 2009 DDS Disability Worksheet),

AR 524–37 (Psychiatric Review Technique Form), AR 538–41 (Mental RFC Assessment), AR (Feb. 3, 2010 DDS Disability Worksheet). After reviewing the medical evidence of record through June 25, 2009, Dr. Kotler found that Daniel's treatment notes described "significant and gradual improvement" when she was compliant with her medications and abstinent from substances. AR 536. The psychologist concluded that Ms. Daniel was capable of unskilled work; she could sustain a regular workweek with casual, non-intensive, and/or limited contact with the public and co-workers, and she was able to respond appropriately to gradual and infrequent changes in work routine. AR 32 (citing AR 523). In February 2010, Dr. Richman reconsidered her claim. AR 548. He found no evidence of any worsening of Ms. Daniel's mental condition and, therefore, affirmed Dr. Kotler's prior assessment. *Id*. The ALJ "afforded weight" to these review physicians' opinions as the opinions of non-examining experts. AR 32.

### 5. Ms. Daniel's Credibility

Insofar as Daniel alleged symptoms and functional limitations that would preclude her from performing the activities described in her RFC, the ALJ found that her allegations were "disproportionate to the objective findings of the medical record, inconsistent with the medical opinion evidence, exaggerated, and not fully credible." AR 30. Her overall mental treatment records did not reflect debilitation or non-functional mental ability associated with disability, especially for 12 or more months. *Id*.

Ms. Daniel had routine and continuous treatment with SNAMH for her mental health complaints, and the treatment notes reflected her stability on her prescribed medication and overall success with medication and treatment compliance. AR 31. There were no reported side effects of her medications other than those addressed with a medication adjustment during her follow-ups at SNAMH. *Id*. The ALJ noted that there was no medical basis for the original alleged onset date of December 22, 2004, and Daniel reported that she was "doing well" on her amended onset date of September 29, 2009. *Id*. (citing AR 543) (stating that she was alert, cooperative, well groomed, and displayed good attention and concentration). Ms. Daniel did not have any surgeries, hospitalizations, or other serious medical treatment since the alleged onset date. *Id*. Dr. Wilson repeatedly found malingering throughout her first psychological examination. *Id*. (citing AR 565–

72). Notably, when SNAMH recommended in April 2012 that she participate in counseling, Daniel stated that she could not go to counseling because she was babysitting her four-year-old granddaughter. AR 31 (citing AR 711). The ALJ found that she did not submit records from a single doctor that substantiated her allegations of disability from her mental or physical conditions, and he stressed that there was no medical opinion in the record that contained a more restrictive RFC. AR 30–31.

Several discrepancies in Ms. Daniel's SNAMH treatment notes further detracted from her credibility. AR 31. She reported difficulty getting a job due to her criminal record for battery and child support issues. AR 31, 517. An October 2010 treatment note documented Plaintiff's request for a report of mental illness to give the district attorney because she owed back child support. AR 557. The ALJ described this as a secondary gain issue since a disability finding would "obviously help with her child support problems." AR 26. The ALJ also noted that Daniel had a poor work and earnings record since 2001, which showed a pattern that correlated with her history of substance abuse. AR 26, 31. Her driver's license was once suspended for "traffic violations" not due to any medical limitations. AR 32. She reported that she was looking for work in May 2010. *Id*. (citing AR 583).[5] In August 2010, she said she felt much better and enjoyed babysitting her grandchildren. AR 31, 558.[6] An April 2012 treatment note revealed that she was *still* babysitting, which indicated to the ALJ that "she had been babysitting for a couple of years during her alleged period of disability." AR 31 (citing AR 711). The ALJ found that this activity was "grossly inconsistent with significant psychiatric disturbance, especially given the rigors of watching such a young child." *Id*. Thus, although Daniel had a history of psychological complaints, the ALJ determined that her impairments did not appear to interfere with her ability to perform all basic work activities. AR 30.

More telling than a chronicle of Daniel's various ailments to the ALJ were her actual activities, which he found inconsistent with her contention that she could not work. AR 31. She

---

[5] *See also* AR 511 (August 2008 treatment note stating that she was cleaning houses for friends on the side); AR 566 (reporting to Dr. Wilson in April 2011 that she was living with a friend and keeping house in return for room and board); AR 592 (August 2011 treatment note stating that she was "looking for jobs").

[6] *See also* AR 601 (January 2012 treatment note reporting that Plaintiff babysitting two grandchildren).

reported that her only chore was to make her own bed. AR 31, 691. On a typical day, she alleged that she did not do anything but lay in bed and watch television. AR 31 (citing AR 691). This allegation significantly reduced her credibility regarding the impact of her alleged impairments on her activities of daily living because a "person who just laid in bed all day watching television could not provide childcare for a young child 2, 3 or 4 years of age." AR 31–32.

The Decision states that all of these factors greatly detracted from any credibility that could be afforded Daniel's subjective complaints of symptoms and functional limitations. AR 32. Although she alleged cognitive limitations, the ALJ found no objective evidence to substantiate such limitations. AR 31. Additionally, there was nothing in the record to suggest she could not handle simple unskilled instructions. AR 32. The totality of the evidence did not support Ms. Daniel's allegations that she could not handle the stress of work, and did not support the extremity of her allegations. *Id*. Factoring in any physical limitations along with the objective record as submitted, the ALJ gave her the maximum possible benefit for her subjective allegations. AR 31. The ALJ determined that reducing her RFC to simple, unskilled work adequately addressed her unsupported allegations of cognitive limitation. *Id*.

### E. Step Four – Ability to Perform PRW

Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an ALJ utilizes the RFC assessment to determine whether a claimant can perform her past relevant work ("PRW"). 20 C.F.R. §§ 404.1520(f), 416.920(f). PRW means work a claimant performed within the last 15 years, either as the claimant actually performed it or as it is generally performed in the national economy. 20 C.F.R. § 404.1560(b). In addition, the work must have lasted long enough for a claimant to learn the job and to perform it as substantial gainful activity. 20 C.F.R. §§ 404.1560(b), 404.1565, 419.960(b), 416.965. If a claimant has the RFC to perform his or her past work, then an ALJ makes a finding that a claimant is not disabled.

At step four in the Decision, the ALJ concluded that Ms. Daniel was unable to perform her PRW as: (i) office manager (DOT 169.167-034),[7] which is performed at a sedentary level of exertion a specific vocational profile ("SVP") of seven; (ii) clerical assistant (DOT 03.5820-054),

---

[7] The DOT refers to the Dictionary of Occupational Titles.

which is sedentary work with an SVP of seven; (iii) receptionist/clerk/bookkeeping (DOT 237-367-038), which is sedentary work with an SVP of four, and (iii) customer service/accounting clerk (DOT 216.482.010), which is sedentary work with an SVP of five.  AR 32.  All of her PRW had more than occasional contact with the public and/or exceeded the RFC limiting her to unskilled work with a SVP of one or two.  As a result, the Decision continued to step five.

### F.  Step Five

Step five of the disability evaluation requires an ALJ to determine whether a claimant is able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If he or she can do other work, then an ALJ makes a finding that a claimant is not disabled.  Although a claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do.  *Yuckert*, 482 U.S. at 141–42; *see also Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012) (citing 42 U.S.C. § 423(d)(2)(A)).

The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, are commonly known as the "Grids," and specific sections are referred to as a Medical-Vocational rule.  The Grids aid the ALJ in the analysis at step five for cases that cannot be evaluated on medical considerations alone.  The Grids consist of three tables that each represent a different physical exertional level: sedentary, light, and medium work.  *Id*.  Each table also presents the vocational factors Congress has identified as important: age, education, and work experience.  If a claimant can perform all or substantially all of the exertional demands at a given exertional level, the Grids direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile.  SSR 83-11, 1983 WL 31252 (Jan. 1, 1983).  When a claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the Grids are used as a framework for decision-making, unless there is a particular rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations.  *See* SSR 83-12, 1983 WL 31253 (Jan. 1, 1983); SSR

83-14, 1983 WL 31254 (Jan. 1, 1983). If the claimant has solely non-exertional limitations, Medical-Vocational Rule 204.00 provides a framework for decision-making. SSR 85-15, 1985 WL 56857 (Jan. 1, 1983).

At step five in the Decision, the ALJ determined that Ms. Daniel could perform jobs that exist in significant numbers in the national economy, considering her age, education, work experience, and RFC, in conjunction with the Grids. AR 32–33. On the alleged date of disability, Daniel was 45 years old, which categorized her as a younger individual age 18–49. AR 32. She has at least a high school education and is able to communicate in English. *Id*. The ALJ found that transferability of her job skills was not was not material to the determination of disability, because using the Grids as a framework supported a finding that she was not disabled, whether or not she had transferable job skills. *Id*.

The ALJ found that Ms. Daniel's ability to perform all or substantially all of the requirements of medium level of work had been impeded by additional limitations. AR 33. To determine the extent to which her limitations eroded the unskilled medium occupational base, the ALJ asked the vocational expert, Jack Dymond, a hypothetical question regarding whether jobs exist in the national economy for an individual with Daniel's age, education, work experience, and RFC. AR 33, 73–81. Mr. Dymond testified that the individual would be able to perform the requirements of three representative jobs categorized as "medium work" with an SVP of two: (1) night cleaner (DOT 381.687-018), with 260 jobs in the Nevada economy and 18,542 jobs in the national economy; (2) cleaner/wall washer (DOT 381.687-026), with 312 jobs in the Nevada economy and 22,252 jobs in the national economy; and (3) hospital cleaner (DOT 323.687-010), with 1,877 jobs in the Nevada economy and 70,519 jobs in the national economy. AR 33, 77. She could also perform the requirements of two representative jobs categorized as "light work" with an SVP of two: (1) officer helper (DOT 239-567-010), with 1,400 jobs in the Nevada economy, and 83,000 jobs in the national economy; and (2) data entry clerk (DOT 239-567-010), with 16 jobs in the Nevada economy, and 5,683 jobs in the national economy. AR 33, 76. Lastly, she could perform the requirements of two representative jobs categorized as "sedentary work" with an SVP of two: (1) surveillance monitor (DOT 379.367-010), with 141 jobs in the Nevada

economy and 10,000 in the national economy; and (2) addresser (DOT 209-567-010), with 29 jobs in the Nevada economy and 12,493 jobs in the national economy.  AR 33, 75–76.

The ALJ found that these jobs represented significant numbers and Dymond's testimony was consistent with the DOT.  AR 33–34.  Considering Daniel's age, education, work experience, and RFC, the ALJ determined that she was capable of making a successful adjustment to other jobs that exist in significant numbers in the national economy.  *Id*.  A finding of "not disabled" was, therefore, appropriate under the framework of Medical-Vocational Rule 203.29.  AR 34.

## III.  THE PARTIES' POSITIONS ON APPEAL

### A.  Ms. Daniel's Position

Daniel seeks reversal and remand of the Decision on the grounds that the ALJ failed to give sufficient reasons supported by substantial evidence for rejecting the opinion of a psychological examining physician.  *See* Pl.'s Mot. (ECF No. 17).  Specifically, Daniel argues the ALJ erred by giving little weight to Dr. Belmont's opinion that Daniel cannot maintain the concentration and attention necessary to work.  Dr. Belmont opined that Daniel can understand, remember, and carry out simple one-and two-step instruction on at least a part-time basis.  *Id*. at 9 (citing AR 695).  However, based on Ms. Daniel's possibly below-average intellectual functioning in conjunction with her depression and anxiety, Dr. Belmont indicated a guarded prognosis.  *Id*.

Daniel argues the ALJ erroneously found that Dr. Belmont's opinion was not consistent with Daniel's treatment notes and other objective medical records.  *Id*. at 10 (citing AR 29).  For example, an October 2010 record indicates that she had received mental health treatment since December 2007 and she was diagnosed with bipolar disorder and depression.  *Id*. (citing AR 550).  Records from March 2011 to February 2013 describe her as depressed, anxious, paranoid, tearful, and in mild distress.  *Id*. (citing AR 589, 601, 612–13, 727, 766).  Thus, her medical records support Dr. Belmont's opinion.  Ms. Daniel asserts the ALJ's finding that Dr. Belmont's opinion was contrary to the medical evidence represents "a medical conclusion that the ALJ is not qualified to make."  *Id*. at 12.  The ALJ therefore failed to provide specific and legitimate reasons supported by substantial evidence in the record for rejecting the opinion of Dr. Belmont.

Ms. Daniel also asserts that the ALJ could not give greater weight to Dr. Kotler's opinion

as a non-examining physician because significant evidence did not support that opinion. The ALJ gave the greatest weight to Dr. Kotler, a reviewing physician. *Id*. (citing AR 32, 524–41). She contends the ALJ "permissibly considered but erroneously afforded great weight to Kotler's opinion." Reply (ECF No. 20) at 4. Dr. Kotler found that insufficient evidence existed to determine the severity of the mental impairments from the alleged onset of December 22, 2004, until October 9, 2007. Mot. at 12 (citing AR 536). Daniel argues that Kotler's opinion relates to a time period before Daniel's amended alleged onset date of September 30, 2009. Reply (ECF No. 20) at 4 (citing AR 22, ¶ 1).

Ms. Daniel also argues that the vocational expert's testimony supports her disability claim. Both Drs. Belmont and Kotler opined that Daniel has moderate to marked limitations responding appropriately to usual work situations and changes in a routine work setting. *Id*. at 4 (citing AR 697–98). This limitation would preclude her from performing any of the jobs identified because Agency regulations indicate that a claimant must show the ability to respond appropriately to changes in a routine work setting. *Id*. at 5 (citing POMS DI 25020.010 ¶B.3.m).[8] For Ms. Daniel to perform the unskilled work the vocational expert identified and the ALJ accepted, she must show the ability to respond appropriately to changes in a routine work setting. However, the vocational expert testified that someone with a marked restriction in the ability to respond appropriately to usual work situations could not maintain employment under such conditions. *Id*. (citing AR 80–81). Therefore, no evidence suggests that Daniel could engage in substantial gainful activity with the limitations assessed by Dr. Belmont. Because the substantial medical record supports her limitations, Ms. Daniel asserts that the court should credit Dr. Belmont's opinion as true and remand for an immediate award of benefits.

---

[8] The Program Operations Manual System ("POMS") is the Agency's internal guidelines. *Kennedy v. Colvin*, 738 F.3d 1172, 1177 (9th Cir. 2013). The Ninth Circuit has held that "POMS may be 'entitled to respect' under *Skidmore v. Swift & Co*., 323 U.S. 134, 65 S. Ct. 161, 89 L.Ed. 124 (1944), to the extent it provides a persuasive interpretation of an ambiguous regulation, but it 'does not impose judicially enforceable duties on either this court or the ALJ'." *Kennedy*, 738 F.3d at 1177–78 (quoting *Carillo–Yeras v. Astrue*, 671 F.3d 731, 735 (9th Cir. 2011)); *see also Lockwood v. Comm'r Soc. Sec. Admin*., 616 F.3d 1068, 1073 (9th Cir. 2010)).

## B. The Commissioner's Position

The Commissioner seeks affirmance of the ALJ's Decision asserting that the ALJ properly assessed Dr. Belmont's opinion.[9]  Cross-Mot. & Resp. (ECF Nos. 18, 19).  Daniel's sole argument for reversing the Decision is her contention that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for the weight afforded to Dr. Belmont's opinion. However, Ms. Daniel's briefing selectively cites objective record evidence, failing to discuss a majority of the objective findings in the record, and largely ignores the treatment notes the Decision discussed in detail.  For example, the treatment notes demonstrate that Daniel responded well to antidepressant medications and she denied side effects from the medication.  *Id*. at 4–5 (citing AR 25–27, 509, 517, 582, 605, 711, 727).

The Commissioner asserts that the ALJ permissibly gave the opinions of Drs. Wilson and Belmont little weight because they were one-time examiners whose findings were contradicted by the treatment notes of Daniel's mental health providers.  *Id*. at 7.  The record shows that, despite feeling depressed, Daniel presented with good focus and concentration, reported she was doing well, had a mostly stable mood and good eye contact, and denied all psychological symptoms.  *Id*. at 7–8 (citing 29, 706, 726, 766).  Ms. Daniel erroneously argues that the ALJ's was not qualified to make a finding that Dr. Belmont's opinion was contrary to the medical evidence.  *Id*. at 8. Agency regulations and Ninth Circuit case law provide that the ALJ has a clear responsibility to consider all of the record evidence, without blindly relying on any individual medical source, and resolve any conflicts between medical source opinions and other medical evidence of record.  *Id*. Thus, the ALJ did not substitute his own interpretation of the evidence for the opinion of medical professionals.  *Id*.  Rather, he permissibly considered the totality of the record evidence.  *Id*.

Additionally, the ALJ permissibly considered and afforded weight to Dr. Kotler's opinion. Kotler opined that Daniel could sustain a regular workweek with casual and limited contact with the public and co-workers, was capable of unskilled work, and was able to respond appropriately to gradual and infrequent changes in her work routine.  *Id*. at 9 (citing AR 32, 523, 540).  Under

---

[9]  The Commissioner notes that Plaintiff does not challenge the ALJ's findings regarding her physical impairments when assessing her RFC.

22

agency regulations and Ninth Circuit case law, the opinion of a reviewing physician can trump that of an examining physician and support the ALJ's RFC findings.

Furthermore, not a single medical opinion in the record contained a more restrictive RFC than the ALJ found. *Id*. at 9 (citing AR 30–31). Thus, even if the ALJ had impermissibly rejected Dr. Belmont's opinion, which he did not, Ms. Daniel fails to show how such an error harmed to her. *Id*. Dr. Belmont did not opine that Daniel could not perform even simple work on a full-time sustained basis. Rather, the psychologist found that Daniel "should be able to understand, remember, and carry out simple one- and two-step instructions on at least a part-time basis", but "may not be able to maintain the concentration and attention necessary to do so," due in part to current psychosocial and environmental problems. *Id*. at 9–10 (citing AR 695). This opinion did not prohibit all simple work on a full time sustained basis. Thus, even if Dr. Belmont's opinion was credited as true, Daniel has failed to show how the opinion warrants a finding of total disability and mandating remand and an award of benefits. Because she failed to establish a reason to disturb the Decision, Ms. Daniel's request for reversal and/or remand should be denied.

## ANALYSIS AND FINDINGS

Reviewing the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit legal error. The sole issue on appeal is whether the ALJ committed reversible error in failing to provide specific and legitimate reasons for giving little weight to Dr. Belmont's opinion.

To the extent there were conflicting opinions and testimony regarding the degree of Ms. Daniel's functional limitations, it was the ALJ's duty to resolve those conflicts. For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress has deferred to agency expertise and, for the sake of uniformity, has minimized the opportunity for reviewing courts to substitute their discretion for that of the agency. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)). Consequently, it is the ALJ's duty "to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id*. (citing 42 U.S.C.

§ 405(g) (directing that the Commissioner's findings shall be conclusive as to any fact supported by substantial evidence); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

In general, a treating physician's opinion is entitled to more weight than an examining physician's, and an examining physician's opinion is entitled to more weight than a reviewing physician's. *Lester v. Chater*, 81 F.3d, 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. However, an ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *See Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012); *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). Agency regulations and Ninth Circuit case law demonstrate that an ALJ can rely on the opinion of a reviewing physician over an examining physician to support the RFC findings. *See, e.g.*, SSR 96-6p, 61 Fed. Reg. 34466 (July 2, 1996); *Bray*, 554 F.3d at 1227–28 (finding that the ALJ reasonably discounted a treating physician's opinion, in favor of the state agency reviewing physician's opinion, as it was based on the claimant's subjective characterizations of her symptoms). Additionally, an ALJ is not required to accept every element of a medical source's opinion in order to give that opinion weight. *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (quoting *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988)).

Here, the Decision provides the ALJ's specific and legitimate reasons to the extent he discounted Dr. Belmont's August 2012 opinion. As the Commissioner points out, Dr. Belmont's opinion was equivocal. Dr. Belmont opined that Ms. Daniel "*should* be able to understand, remember, and carry out simple one-and two-step instructions on at least a part-time basis," "*may* not be able to maintain the concentration and attention," and "*may* also have difficulty remembering, understanding, and carrying out a variety of detailed and complex instructions on even a part-time basis." AR 695 (emphasis added). The psychologist questioned whether Daniel had the ability to "interact appropriately with supervisors, co-workers, and the public on even a part-time basis" based on her significant anxiety. *Id*. Ms. Daniel "appeared to be extremely

anxious" during the August 2012 exam and reported "significant panic" any time she left the house. *Id*. Dr. Belmont opined that Daniel's prognosis was guarded given the "chronic and somewhat intractable nature" of Daniel's psychiatric symptoms, which did not appear to be adequately controlled on her medication regimen. *Id.*

However, the ALJ pointed out that SNAMH's October 2012 treatment note states that Ms. Daniel denied all psychological symptoms, despite reporting that she was depressed. AR 29 (citing AR 726).[10] The SNAMH doctor made no changes in her medications. AR 726. At her February 2013 follow-up, she reported doing well and that her current medications were beneficial. AR 29 (citing AR 766 (" 'I'm doing pretty good'.")).[11] The ALJ noted, "Besides some personal stressors/losses, she endorsed a mostly stable mood, and denied psychological symptoms." *Id*. These positive, post-exam reports were consistent with Daniel's SNAMH records prior to August 2012. *See, e.g.*, AR 508–09, 513–17, 542–43, 555–59, 586–87, 591, 593, 605, 607, 613, 620, 711. The ALJ provided specific and legitimate reasons why he afforded Dr. Belmont's opinion little weight. Additionally, the ALJ was qualified to make a finding that Dr. Belmont's opinion was contrary to the medical evidence. The ALJ's has a duty to resolve conflicting testimony and ambiguities in the record. *See Treichler*, 775 F.3d at 1098. By doing so in this case, the ALJ did not substitute his own interpretation of the evidence for the opinions of medical professionals. As the fact-finder, he permissibly considered the totality of the record evidence.

Ms. Daniel's RFC is also supported by the opinions of the state agency review psychologists, Drs. Kotler and Richman, and the first psychological consultative examiner, Dr. Wilson. Daniel does not challenge the ALJ's findings regarding the examining physicians who evaluated her physical conditions. Dr. Kotler found that Daniel's records showed "significant and

[10]  Plaintiff's October 2012 treatment note states, "She denied racing thoughts, reports good focus and concentration…. Affect is appropriate to the situation. She describes overall mood "depressed" she denies thoughts to harm self or others. Denies auditory/visual hallucinations. No delusional or bizarre thoughts noted. Reports/denies anxiety and panic." AR 726.

[11]  *See also* AR 779–81 (April 2013 treatment note: "Pt. reports that she is responding well to her current regimens and denies side-effects. She admits to significant improvements with her mood and anxiety since Buspar was increased on her last visit. She denies depressed mood and lack of interests."); AR 777 (May 2013 treatment note: "Adverse effects: denies. … Verbalized she is stable with her current medications, appears to benefit from treatment."); AR 775 (June 2013 treatment note: "She reports fairly doing well on her current regimens and denies side-effects. She feels stable on her med.").

gradual improvement" of her condition and, therefore, opined that Daniel was capable of unskilled work; she could sustain a regular workweek with casual, non-intensive, and/or limited contact with the public and co-workers, and she was able to respond appropriately to gradual and infrequent changes in work routine. AR 523, 536. On reconsideration, Dr. Richman found no evidence of any worsening of Ms. Daniel's mental condition and, therefore, affirmed Dr. Kotler's assessment. AR 548. Dr. Wilson expressly found malingering and opined that Daniel could maintain concentration to carry out simple tasks, typical of unskilled work. AR 570–71. The psychologist further opined that her ability to follow simple instructions was good and she should be able to get along with supervisors, coworkers, and the public. AR 570. It was the ALJ's job to consider the opinions of Drs. Kotler, Richman, and Wilson along with the record evidence, and resolve any conflicts they presented with Dr. Belmont's opinion.

If the record will support more than one rational interpretation, the court must uphold the Commissioner's interpretation. *See Burch*, 400 F.3d at 679. The ALJ's findings in this case are amply supported by the record and inferences reasonably drawn from the record. Reviewing the record as a whole, the court therefore finds that the ALJ did not commit reversible error in his assessment that Ms. Daniel could perform unskilled work and the ALJ properly relied upon Medical Vocational Rule 203.29, which directed a finding that she was not disabled.

## CONCLUSION

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole. It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record as a whole, and resolve conflicts in the evidence and differences of opinion. Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

Accordingly,

/ / /

/ / /

**IT IS RECOMMENDED:**

1.  Plaintiff Lena J. Daniel's Motion to Reverse/Remand (ECF No. 17) be DENIED.

2.  The Commissioner's Cross-Motion to Affirm (ECF No. 18) be GRANTED.

3.  The Clerk of Court be instructed to enter judgment accordingly and close this case.

Dated this 25th day of May, 2017.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE